**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**AMANDA M. GILL,**

    **Plaintiff,**

                                    **Civil Action 2:19-cv-4610**

    **v.**                            **Chief Judge Algenon L. Marbley**

                                      **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Amanda M. Gill ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 11), Plaintiff's Reply (ECF No. 12), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.        PROCEDURAL HISTORY

Plaintiff protectively filed her application on April 29, 2014, alleging that she became disabled on March 28, 2013. (R. at 164.) Plaintiff's applications were denied administratively and a hearing was held on November 7, 2016, before an Administrative Law Judge ("ALJ"), who issued an unfavorable determination on January 12, 2017. (*Id.* at 19–38.) After the Appeals Council declined to review the ALJ's determination (*Id.* at 1–3), Plaintiff sought review in this Court. The parties successfully moved for a joint remand for further proceedings. *Amanda M.*

*Gill v. Comm'r. Soc. Sec.*, 2:18-cv-84, United States District Court Southern District of Ohio, Eastern Division. Upon remand, a new hearing was held before the ALJ on May 29, 2019 (R. at 541–73), and the ALJ issued a second unfavorable determination on June 29, 2019 (*Id.* at 520–40). Plaintiff declined to file written exceptions to the Appeals Council, and the ALJ's second determination became final. Plaintiff seeks judicial review of that second determination.

In this action, Plaintiff alleges that the ALJ committed reversible error when she assessed Plaintiff's residual functional capacity ("RFC")[1]. Specifically, Plaintiff contends that the ALJ erred by failing to explain why she did not incorporate into Plaintiff's RFC a "one task at a time" limitation that had been opined by state agency reviewing psychologists Karla Voyten, PhD. and Carl Tishler, PhD. (Pl.'s Statement of Errors, ECF No. 10; Pl's. Reply, ECF No. 12.) Plaintiff also contends that the ALJ erred by failing to incorporate into Plaintiff's RFC a prompting limitation opined by Drs. Voyten and Tishler. (Pl.'s Statement of Errors, ECF No. 10.) Plaintiff further alleges that the ALJ erred by failing to incorporate into Plaintiff's RFC the proper percentage of time that Plaintiff would be off task during the workday. (*Id.*)

## II. THE ALJ's DECISION

On June 29, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 520–40.) The ALJ first found that Plaintiff meets the insured status requirements through June 30, 2017. (*Id.* at 523.) At step one of the sequential

---

[1] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity from the alleged date of onset, March 28, 2013, through the date last insured, June 30, 2017. (*Id.* at 526.) At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, degenerative disc disease status post discectomy with radiculopathy, obesity, depression, panic disorder with agoraphobia and fibromyalgia. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

At step four, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant has the residual functional capacity to perform sedentary work as as defined in 20 C.F.R. 404.1567(a) except sit and stand option every hour for 2 to 3 minutes on task, frequent reaching in all directions with

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

bilateral upper extremities, occasional climbing of ramps and stairs, must avoid ladders, ropes or scaffolds, occasionally stoop, kneel, crouch and crawl, can use a cane as needed and will be off task 30 minutes over the course of a day. Additionally, the claimant is limited to simple, routine tasks, occasional changes in the work setting, occasional but superficial interaction with the public, coworkers and supervisors (superficial defined as that which is beyond the performance of job duties and functions for a specific purpose and for short duration), no fast pace work or strict production quotas.

(*Id*. at 527–28.)

When assessing this RFC, the ALJ considered the record evidence, including Plaintiff's hearing testimony, treatment records and other clinical and laboratory findings, and medical opinion evidence. (*Id.* 528–32.) With regard to the medical opinion evidence about Plaintiff's physical limitations, the ALJ assigned "little weight" to the opinions of state agency medical consultants who reviewed Plaintiff's file because the evidence received at the hearing level showed that Plaintiff was more limited than they had opined. (*Id*. at 531.) With regard to medical opinion evidence about Plaintiff's mental limitations, the ALJ assigned partial weight to the opinions of state agency psychological consultants Drs. Voyten and Tishler because their opinions were generally consistent with the weight of the evidence. (*Id*.) At step five of the sequential process, relying on testimony from Vocational Expert Jerry Olsheski ("VE"), the ALJ found that Plaintiff was not capable of performing her past relevant work as a nurse assistant, cashier, or fast food worker. (*Id*. at 532.) The ALJ, relying again on the VE's testimony, nevertheless concluded that given Plaintiff's age, education, work experience, and RFC, there were jobs in the national economy that Plaintiff could perform including, for example, assembler and sorter. (*Id*. at 532–33.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id*. at 533.)

### III.    RELEVANT RECORD EVIDENCE[3]

**A.    Plaintiff's Testimony**

At the hearing, Plaintiff testified that she had back surgery in 2013 but continued to experience pain.  (*Id*. at 552.)  She further testified that her doctors were discussing spinal fusion but that her diabetes needed to be better controlled before that procedure.  (*Id*.)  She described her pain as dull, aching, and throbbing, and that it started in her lower back hip and extended to her groin and legs.  (*Id*.)  She also testified that she had experienced daily loss of bladder control.  (*Id*. at 552–53.)  She indicated that her back problems prevented her from driving and attending her children's activities; made household work hard; and that she could not bend, squat, or stoop.  (*Id*. at 553.)  Plaintiff stated that she drove when necessary and could put gas in her car but generally allowed others to drive her to activities and the store.  (*Id*. at 564.)  She cooked easy meals for her kids and visited daily with friends.  (*Id*. at 565–66.)  Plaintiff indicated that she used a cane because she would get off balance due to pain and neuropathy and that sometimes her limbs got numb and she stumbled.  (*Id*. at 554.)  Plaintiff testified that with regard to her mental health, she felt not good, worn down, depressed, and had mood swings.  (*Id*. at 558.)  She did get up every day out of bed, get dressed, and take baths but she had sporadic crying spells and experienced panic attacks that woke her up in the middle of the night and could happen during the day.  (*Id*. at 559–60.)  She further testified that she had memory issues since she was a child and that her memory had gotten worse since her back surgery.  (*Id*. at 561.)

---

[3] The record also contains medical records from two providers, Surgery and Gynecology, and OSU Division of Endocrinology.  (ECF No. 7–7, 7–13.)  Although those records were reviewed, they are not summarized in this R&R.

B.      **Medical Evidence - Physical Health**

    1.  **Medical Records**

        a.  **Gregory W. Balturshot, M.D. and Gregory M. Figg, M.D.**

On May 6, 2013, Plaintiff was examined by Gregory W. Balturshot, M.D.  (*Id*. at 295.) Dr. Balturshot wrote that Plaintiff reported severe pain in her low back, right hip, and legs and that her pain mainly went down her right leg to the lateral and inferior aspect of her foot and that this pain worsened with coughing and sneezing.  (*Id*.)  Dr. Balturshot wrote that Plaintiff was in mild distress.  (*Id*. at 296.)  Plaintiff's mental status examination was intact with regard to orientation, memory, attention, language, and knowledge.  (*Id*.)  Plaintiff's gait, station, tone, and coordination were all normal and her sensation was intact.  (*Id*.)  Plaintiff had a positive straight raising sign that caused reproduction of lower extremity pain with lifting her leg at about 20 degrees.  (*Id*.)  Plaintiff indicated that an MRI had revealed a large right sided L5-S1 disc herniation but she did not bring the films for review.  (*Id*.)  Dr. Balturshot opined that Plaintiff might be a good candidate for surgery but he needed to review the MRI scan personally before he could make that recommendation.  (*Id*.)

On May 10, 2013, Plaintiff returned with the MRI scan.  (*Id*. at 303, 312–13.)  Dr. Baltershot wrote that it revealed a large right paracentral disc herniation that had migrated slightly below the disc space and was significantly effacing the S1 nerve root.  (*Id*. at 303.)  They discussed a L5-S1 microdisectomy.  (*Id*.)  On June 6, 2013, Plaintiff underwent that procedure.  (*Id*. at 316–18.)  She was discharged the following day.  (*Id*. at 320.)  On July 5, 2013, Dr. Baltershot wrote that Plaintiff had good results from the surgery and that she had no residual pain in her leg.  (*Id*. at 304.)  Plaintiff was released from Dr. Baltershot's care with instructions to return on an as needed basis.  (*Id*.)

On May 22, 2014, Plaintiff returned to see Dr. Baltershot. (*Id.* at 305.) Plaintiff reported experiencing back pain and lower bilateral extremity pain that did not go below her knees for the last two months. (*Id.*) She indicated that lying for long periods made it worse, nothing gave her relief, and that her pain was a 7 out of 10. (*Id.*) Dr. Baltershot's examination revealed that Plaintiff had a 5/5 strength in her lower extremities and that straight leg raise only caused low back pain with no radicular symptoms. (*Id.*) Dr. Baltershot ordered an MRI. (*Id.*)

An MRI of the L-Spine with and without contrast ordered by Dr. Baltershot on July 29, 2014, showed that the large disk protrusion present on the April 2013, MRI was no longer present. (*Id.* at 324, 464.) Although there were post-surgical changes at L5-S1 including enhancement at the right foramen suggesting some degree of post-surgical fibrosis, there was no evidence of recurrent disk protrusion. (*Id.*)

On August 5, 2014, Plaintiff returned to see Dr. Baltershot and discuss the results of her study. (*Id.* at 323.) He noted that the large disc herniation noted on her pre-operative film was no longer present but that she had some minor degenerative spondylosis. (*Id.*) Dr. Baltershot opined that the only option surgically would be an instrumented fusion from L5 to S1 but that he was reluctant to consider this given her young age of 31. (*Id.*) Dr. Baltershot recommended treatment with medial branch blocks with possible rhizotomies at the L5-S1 level and to reevaluate after that. (*Id.*) He referred her to Gregory M. Figg, M.D. (*Id.* at 517.)

On October 30, 2014, Plaintiff was examined by Dr. Figg. (*Id.*) Dr. Figg wrote that Plaintiff complained that her number one issue was her right leg although she had incidental neck pain and right upper extremity tingling. (*Id.*) Upon examination, Plaintiff had a well healed surgical scar in the lumbar spine with paraspinal tenderness in the region. (*Id.* at 518.) Extension was painful and Plaintiff had a positive straight leg test on the right. (*Id.*) Her gait

was antalgic favoring the right lower extremity.  (*Id*. at 518–19.)  Dr. Figg's treatment plan was to prescribe pain medications; obtain an X-Ray of Plaintiff's neck; prescribe physical therapy for her neck; and to do transforaminal epidural steroid injections at right L5.  (*Id*. at 519.)  On December 6, 2014, Dr. Figg wrote that the first epidural injection Plaintiff received was helpful for about ten days and that his goal with a second injection on that date was prolonged improvement.  (*Id*. at 1017.)

On March 10, 2015, Dr. Baldershot wrote that Plaintiff reported intermittent bowel and bladder symptoms but that she had normal strength in her lower extremities.  (*Id*. at 424)  An MRI of the L-Spine with and without contrast ordered by Dr. Baltershot on March 31, 2015, revealed post-surgical changes along the posterior aspect of the right paracentral disk at L5-S1 with enhancement suggesting scarring but no significant displacement of the descending right S1 nerve root.  (*Id*. at 467)  It also revealed possible left paracentral protrusion without significant interval change but again without clear deviation of the S1 nerve root or frank associated stenosis.  (*Id*. at 467–68.)

On April 9, 2015, Dr. Figg wrote that Plaintiff had received a couple of epidural steroid injections, but they were not effective in diminishing her symptoms which suggested that her pain was not inflammatory in nature.  (*Id*. at 947.)  Plaintiff reported that Gabapentin did help and when she took extra it was more helpful.  (*Id*.)

In June 2015, Dr. Baltershot wrote that Plaintiff's MRI was "pretty benign."  (*Id*. at 426.)  He informed Plaintiff that her options included conservative management and weight loss, which was paramount, epidurals, which she had not responded to, and microdisectomy, but that he did not see any significant nerve root compression.  (*Id*.)

A January 8, 2016 X-ray of the L-Spine ordered by Dr. Figg was unremarkable and reveled no acute abnormalities.  (*Id*. at 487.)  On March 9, 2016,  Dr. Figg wrote that Plaintiff was neurologically intact but that she continued to have significant low back and lower extremity pain.  (*Id*. at 956.)  He noted that Plaintiff appeared to fill her medications a little less than allowed and that she had not been using Gabapentin more than once a day.  (*Id*.)  Dr. Figg explained that it would most likely work better if she used it at least twice a day.  (*Id*.)  Upon examination, Plaintiff exhibited lumbar tenderness with limited range of motion but her gait was intact.  (*Id*. at 959.)

On March 18, 2016, Dr. Baltershot wrote that Plaintiff had done well with her radicular symptoms after her microdisectomy, but that her long-standing axial pain was not likely to improve.  (*Id*. at 904.)  He found no bowel or bladder issues.  (*Id*.)  Upon examination, Plaintiff had a 5/5 on motor strength to all extremities.  (*Id*. at 906.)  He noted again that because of her age, he would not recommend an instrumented fusion of L5-S1, but that no other surgical options were available.  (*Id*. at 907.)  She would need to quit smoking and have her diabetes under control before surgery.  (*Id*.)  Dr. Baltershot ordered a new MRI.  (*Id*.)  An MRI of the L-Spine with and without contrast on April 11, 2016, revealed no change since the prior MRI on March 31, 2015.  (*Id*. at 488.)

On July 5, 2016, Dr. Baltershot personally reviewed Plaintiff's most recent MRI and noted disc bulge and facet changes at L5-S1 with some postoperative scar tissue on the right side, and modic endplate changes suggesting degenerative spondylosis.  (*Id*. at 911.)  He diagnosed L5-S1 degenerative disc disease.  (*Id*.)  Dr. Baldershot wrote that he was "very frank" with Plaintiff.  (*Id*.)  He told her that he efficacy of lumbar fusion for axial low back pain was equivocal but she was now developing radicular symptoms which might be more responsive to

surgical intervention.  (*Id.*)  Such a procedure would likely entail an L5-S1 laminectomy, facetectomy, posterior lateral arthrodesis with pedicle screw instrumentation, and would probably be supplemented by interbody fusion.  (*Id.*)  There was risk associated with going forward with this due to Plaintiff's young age, her minor facet arthropathy at the L4-5 levels, her smoking, her poor glucose control, and her weight.  (*Id.*)  Dr. Baltershot felt that the symptoms in Plaintiff's legs would nevertheless be responsive to surgery as far as radicular pain but that he could not guarantee her relief from axial back pain.  (*Id.*)  Plaintiff agreed to think about this and get back to Dr. Baltershot if she wanted to proceed with surgery.  (*Id.*)

Plaintiff continued to treat with Dr. Figg.  On December 5, 2016, Dr. Figg noted that Plaintiff had cut back on smoking, lost weight, and was working to better control her diabetes. (*Id.* at 967.)  Plaintiff reported that her medication worked well but that it seemed to wear off sooner than it used to.  (*Id.*)  Upon examination, Plaintiff exhibited lumbar tenderness, positive straight leg test bilaterally, and antalgic gait with mildly stooped posture.  (*Id.* at 971.)  On August 28, 2017, Dr. Figg wrote that Plaintiff was still a poor candidate for lumbar fusion because of her diabetic complications but that she was making good progress with regard to issues that needed to be resolved before she could have further surgery.  (*Id.* at 977.)  Her pain was a 6 out of 10.  (*Id.* at 978.)  Upon examination, she exhibited lumbar tenderness and limited range of motion but her strength was intact.  (*Id.* at 981.)  No problems with gait were noted. (*Id.*)  On May 17, 2018, Dr. Figg noted that Plaintiff was still working to resolve issues that needed to be addressed in order to proceed with surgery.  (*Id.* at 987.)  Plaintiff described her pain as a 6 out of 10, indicated that her medications as prescribed provided some relief, and that the management she was receiving was useful with minimal side effects.  (*Id.*)  She again exhibited lumbar tenderness and limited range of motion but intact strength.  (*Id.* at 990.)  On

February 19, 2019, Plaintiff rated her pain as an 8 out of 10, indicated that things had gotten somewhat worse, and that she experienced a popping sensation in her back.  (*Id*. at 996.) Although she indicated that her medications were helpful, she was not satisfied with the degree of pain she experienced.  (*Id*.)  Dr. Figg indicated that he would ask Plaintiff's primary care doctor to consider an alternative to alprazolam for Plaintiff's anxiety medication based on the possibility of it interacting with opioid medications.  (*Id*.)  Plaintiff again exhibited lumbar tenderness and limited range of motion but intact strength.  (*Id*. at 999.)  At all these visits, Dr. Figg wrote that Plaintiff was alert and oriented to person, place, and time, and that her affect was normal.  (*Id*. at 971, 981, 990, 999.)

### b.  Marc Carroll, D.O. and Other Providers at MCMG Selina

Notes from a March 28, 2013 office visit with Plaintiff's primary care physician, Marc Carroll, D.O., indicate that Plaintiff complained about back pain.  (*Id*. at 252.)  On May 28, 2013, Dr. Carroll wrote that Plaintiff reported that her anxiety was worsening but that she experienced slight relief with deep breathing exercises.  (*Id*. at 256.)  On July 31, 2013, Plaintiff reported experiencing headaches for the last several weeks, light-headedness, and blurry vision but that a recent eye examination was normal.  (*Id*. at 260.)

At these and other routine office visits with Dr. Carroll through October 12, 2015, physical and psychiatric examinations revealed generally normal results.  (*Id*. at 247, 249, 251, 255, 259, 263, 267, 419, 417, 415, 411, 407, 402, 395, 379.)  Plaintiff continued to treat at MCMG Selina with Paul Jentes, D.O. throughout 2016 and 2017.  The records routinely indicate that examinations during those office visits revealed that Plaintiff's motor strength and tone were normal.  (*Id*. at 776, 783, 787, 791, 798, 808, 813, 817.)  Plaintiff frequently exhibited normal movement in all directions.  (*Id*. at 776, 808, 813, 817.)  Plaintiff had normal gait or normal gait

and station or ambulated normally.  (*Id*. at 798, 808, 813, 817, 776, 783, 787, 791.)  In addition, Plaintiff's recent and remote memory were normal.  (*Id*. at 776, 787, 811.)  Moreover, Plaintiff's mood and affect were normal.  (*Id*. at 776, 783, 787, 791, 798, 808, 811, 813, 816.)

### c.  Emergency Department at Diley Ridge Medical Center

On April 3, 2013, Plaintiff visited the emergency room because of intermittent low back pain that had been gradually increasing in frequency and severity.  (*Id*. at 446.)  Plaintiff reported that she typically developed pain after working as a nurse's assistant and that she often did heavy lifting at work.  (*Id*.)  She described her pain as tight and stated that it radiated down into her right posterolateral lower extremity to her foot and was made worse by movement including standing from a sitting position and walking.  (*Id*.)  She rated her pain as a 7 out of 10.  (*Id*.)  Examination results were generally normal although Plaintiff had some tenderness on palpitation over the right posterior crest and sacroiliac join and a slight decrease in leg strength in her right leg likely secondary to pain.  (*Id*. at 448.)  An MRI of the L-Spine without contrast revealed prominent disk protrusion at L5-S1 with compression of the sac and origin of the right nerve root causing mild displacement of the root posterity.  (*Id*. at 449.)  This caused mild canal stenosis. (*Id*.)

On January 8, 2014, Plaintiff visited the emergency room because of chest pain.  (*Id*. at 452.)  Chest-x rays and laboratory results were normal and unremarkable although Plaintiff had chronic leukocytosis.  (*Id*. at 454.)  She was discharged in stable condition.  (*Id*.)

In April 2015, Plaintiff was treated at the emergency room for the flu.  (*Id*. at 469–78.)  A chest X-ray at that time revealed no dense consolidation, pleural effusion, pneumothorax, or acute cardiopulmonary disease.  (*Id*. at 473.)

On September 5, 2015, Plaintiff visited the emergency room because of pain in her left shoulder and neck.  (*Id*. at 480.)  Plaintiff reported that the pain had started about a year ago but began to get worse approximately a week prior to her visit when it began to radiate down her left arm and shoulder blade and that it sometimes radiated from her neck up and caused headaches and pain behind her left ear.  (*Id*. at 480.)  She also reported that her ring finger was swollen and tingly.  (*Id*.)  A physical examination revealed tenderness with palpitation along the paraspinal muscles of the left cervical spine and along the trapezius and over and before meals joint on the left.  (*Id*.)  Pain was reproduced with abduction of the left arm against resistance, but her hand grips were equal bilaterally.  (*Id*. at 481.)  An EKG and chest X-ray were normal.  (*Id*. at 481, 485–86.)  An X-Ray of the cervical spine was also normal.  (*Id*. at 485.)

On June 4, 2016, Plaintiff sought treatment at the emergency room for chest pain.  (*Id*. at 490.)  An EKG, chest X-Ray, and laboratory tests were generally normal although her white blood cell count was elevated.  (*Id*. at 492.)  The attending physician noted that Plaintiff appeared slightly anxious and that Plaintiff reported recently losing a friend to cervical cancer and that this may have contributed to her symptoms.  (*Id*. at 493.)  On August 17, 2016, Plaintiff sought treatment from the emergency room for nausea and dizziness.  (*Id*. at 502.)  An EKG and chest X-ray were normal.  (*Id*. at 506–08.)  Laboratory tests revealed elevated white blood cell count and hypoglycemia.  (*Id*. at 504.)  The attending physician wrote that Plaintiff's diabetes was poorly controlled.  (*Id*.)  Plaintiff also reported that she had been taking Xanax "for years" but had not taken one for three days.  (*Id*.)  The attending physician suspected possible withdrawal.  (*Id*.)  Plaintiff was given IV fluids and a Xanax and instructed to follow up with her primary doctor.  (*Id*.)

The records from this provider routinely indicate that upon examination, Plaintiff was awake, alert, and oriented, and that her mood and manner were appropriate.  (*Id*. at 448, 454, 470, 477, 480, 492, 504.)

### 2.  Medical Opinions

On July 10, 2014, non-examining state agency physician Dr. Sutherland reviewed Plaintiff's file upon initial consideration.  Dr. Sutherland opined that plaintiff could perform light work (i.e., she could stand and/or walk for up to 6 hours in an 8 hour workday, lift 10 pounds frequently, and occasionally lift up to 20 pounds).  (*Id*. at 81.)  Dr. Sutherland further opined that Plaintiff could frequently crouch; occasionally stoop, crawl and climb ladders, ropes, or scaffolds; and could climb ramps or stairs, balance, and kneel without limitations.  (*Id*.)  Dr. Sutherland noted that Plaintiff had back pain complicated by obesity and that she used a cane for balance although no need for a cane had been reported by a recent neurosurgical examiner.  (*Id*.)  Dr. Sutherland further opined that Plaintiff should avoid concentrated exposures to hazards, specifically, exposure to unprotected heights.  (*Id*. at 82.)

On November 1, 2014, non-examining state agency physician Dr. Amiri reviewed Plaintiff's file upon reconsideration.  Like Dr. Sutherland, Dr. Amri opined that Plaintiff could perform light work.  (*Id*. at 96–97.)  Dr. Amiri also opined the same postural limitations that had been opined by Dr. Sutherland, except that Dr. Amri also opined that Plaintiff could only occasionally climb ramps or stairs or kneel.  (*Id*. at 97.)  In addition, Dr. Amri wrote that during a phone call with Plaintiff during reconsideration, Plaintiff indicated that she was able to walk independently.  (*Id*.)  Dr. Amri did not opine that Plaintiff had any other limitations.  (*Id*.)

**C.     Mental Records – Mental Health**

   **1.  Medical Records**

Plaintiff sought mental health services from Access Ohio.  Notes from a diagnostic assessment dated July 30, 2013, indicated that Plaintiff had previously been diagnosed with anxiety disorder, social phobia, agoraphobia, depression, and a mood disorder and that she had received counseling and psychiatric services elsewhere but was not satisfied with those services. (*Id*. at 274.)  Plaintiff reported that she had a full hysterectomy two years prior and that this negatively impacted her mental health. (*Id*. at 274, 282.)  Plaintiff indicated that she was a good mother and partner, she was loyal and honest with a good sense of humor, she had a couple of close friends, and that she had no limitations with regard to her activities of daily living.  (*Id.* at 275.)  Plaintiff also indicated that although she had a learning disability, she had graduated high school.  (*Id*.)  Plaintiff reported that she did not like to be around other people, that she would have panic attacks at work that ended with her having to go to the hospital, and that she became overwhelmed at work and was absent "a lot" due to her mental health issues.  (*Id*. at 276.) Nevertheless, she had good work performance.  (*Id*.)  Plaintiff also reported having panic attacks two-to-three times a day, that her panic attacks frequently made her feel like she might faint, and that she felt anxiety about her family, herself, and her finances.  (*Id*. at 279.)  Grocery shopping caused her extreme anxiety and she would have panic attacks in a large crowd of people.  (*Id*.) Plaintiff reported feeling depressed once or twice a week and that she felt depressed about her parents' deteriorating health, her grandmother, who was a major support system, recently passing away, her weight gain— which she attributed to her hysterectomy— and her mental and physical health.  (*Id*.)  When depressed, Plaintiff was easily irritated, fatigued, and did not want to be around people or do anything.  (*Id*.)  Her irritability had gotten worse since her hysterectomy.

(*Id*.)  Plaintiff also reported that she was physically and emotionally abused by her father and that she had been harassed and sexually assaulted by a family friend when she was a child.  (*Id*.)  Plaintiff stated that she had problems paying attention and focusing on a daily basis, that her fiancé had to repeat things, that she had trouble remembering things, and that she would have to be redirected in order to get things done.  (*Id*. at 280.)  Plaintiff indicated that she was very forgetful due to her anxiety and that this had been a problem since she was a child.  (*Id*.)  Plaintiff had problems sleeping without medications due to racing thoughts and panic attacks.  (*Id*.)  A mental status examination indicated that Plaintiff's mood was mildly depressed, moderately anxious, and moderately irritable, but that she was cooperative, logical, her affect was full, she had fair insight, and that no issues with concentration were reported.  (*Id*. at 284.)  The notes indicate that Plaintiff was diagnosed with panic disorder with agoraphobia and major depressive disorder, mild, and that ADHD needed to be ruled out.  (*Id*. at 282.)  Plaintiff's GAF score was 35.  (*Id*.)

Notes from an August 9, 2013 behavioral health assessment state that Plaintiff indicated that she exercised regularly and that she walked "some."  (*Id*. at 287.)  She further indicated that she spent time with her children and family and went camping and swimming, but could not work.  (*Id*.)  She explained that her fibromyalgia and low back pain, which she experienced on a daily basis, was a 5 on a 10-point scale, and that it was aggravated by rain, moving too much, or by walking too far or too much.  (*Id*. at 288.)  Sometimes in the mornings it was hard for her to move her hands.  (*Id*.)  Plaintiff controlled her pain by laying around and resting and taking over the counter medications.  (*Id*.)  Plaintiff also reported experiencing daily headaches after taking Effexor and reported a history of febrile seizures.  (*Id*. at 289.)

Progress notes dated March 19, 2014, state that Plaintiff was "doing ok" and that her "social phobia" was "getting better." (*Id*. at 293.) The notes indicate that Plaintiff was being prescribed Sertraline and Xanax. (*Id*. at 294.) A mental status examination indicated that Plaintiff's mood was "euthymic/anxious at times" and that her mood was restricted. (*Id*.) Nevertheless, her thought processes were logical, she had no delusions or hallucination, her behavior was normal, her cognition intact, and her insight was fair. (*Id*.) The progress notes also state "meds helping." (*Id*. at 294.)

Notes from an August 4, 2014 evaluation indicate that Plaintiff's Xanax and Zoloft had been increased and that hydroxyzine had been added to help her sleep. (*Id*. at 355.) Plaintiff reported that she was doing better than at her last visit with regard to her anxiety. (*Id*.) Plaintiff endorsed that even though she still had panic attacks that were problematic, they occurred every other day instead of every day and that they were less severe. (*Id*.) She reported that she still had issues leaving the house and that her anxiety worsened in public places and around others including at doctor appointments. (*Id*.) A mental status examination revealed that Plaintiff's mood was depressed and anxious but her affect was full, her thoughts were logical, and that she reported no impairment in attention or concentration. (*Id*. at 357.) Her GAF score was 55–60. (*Id*.) The notes indicated that Plaintiff was "stable" on her current medication regime with recent dosage increases, and her Zoloft might be increased if she did not continue to improve. (*Id*. at 358.)

A behavioral health assessment dated September 9, 2014, indicates that the reason for Plaintiff's visit was social anxiety and that Plaintiff stated that she had "improved since coming here." (*Id*. at 335.) Plaintiff reported that she exercised regularly by walking and riding bikes and that she spent time with her kids, camped, and swam but was not currently employed. (*Id*.)

She reported experiencing chronic ache-type pain all over that was aggravated by stress, tension, standing or sitting too long, and that it impacted her everyday life.  (*Id*. at 337.)  Plaintiff controlled her pain with rest and massages.  (*Id*.)  She would sometimes not know that she was stressed out and would have a panic attack, at which point she would take her medications and pray.  (*Id*.)

Progress notes dated June 16, 2016, indicate that Plaintiff experienced anxiety related to her back surgery, that she had panic attacks and bowel and bladder issues.  (*Id*. at 443.)  A mental status examination indicated that although Plaintiff's mood was anxious/euthymic she was alert and oriented, she had linear and goal-oriented thought processes, no paranoia, delusions, or hallucinations, her cognition and insight were fair, and that she was cooperative.  (*Id*.)  The notes state "strongly encourage counseling."  (*Id*. at 444.)  Progress notes dated August 1, 2016, state that Plaintiff was going to have a spinal fusion and that she was experiencing back and knee pain.  (*Id*. at 441.)  Plaintiff reported that her relationship with her husband was poor and that he was not supportive.  (*Id*.)  A mental status examination indicated that Plaintiff's mood was depressed, dysthymic, and tearful, but she was alert and oriented, had linear and goal-oriented thought processes, no paranoia, delusions, or hallucinations, her cognition and insight were fair, and that she was cooperative.  (*Id*.)  She was prescribed Fetzima.  (*Id*. at 442.)  Although Plaintiff was again encouraged to go to counseling, she was reluctant because she could not open up to anyone.  (*Id*.)  Progress notes dated September 26, 2016, state that Plaintiff did not like Fetzima and that she stopped taking it after a few days.  (*Id*. at 439.)  Plaintiff was feeling depressed but mostly because of her back pain, and she was still waiting to hear from her neurosurgeon for back surgery.  (*Id*.)  Plaintiff stated that she felt that the Zoloft and the Xanax were working fairly well and she preferred to continue her current medications.  (*Id*.)  Although

her mood was depressed, dysthymic, and her affect restricted in range, she was alert and oriented, had linear and goal-oriented thought processes, no paranoia, delusions, or hallucinations, her cognition and insight were fair, and she was cooperative.  (*Id*.)

### 2. Medical Opinions

On July 14, 2014, non-examining state agency psychologist Dr. Voyten reviewed Plaintiff's file upon initial consideration.  With regard to Plaintiff's understanding and memory limitations, Dr. Voyten opined that Plaintiff was moderately limited with regard to her ability to understand and remember detailed instructions.  (*Id*. at 83.)  Dr. Voyten wrote that Plaintiff reported problems paying attention, focusing and remembering, and that she needed redirection to finish tasks; Plaintiff had a diagnosis of ADHD; and that Plaintiff's memory is limited by a diminished ability to concentrate on one task at a time.  (*Id*.)  Dr. Voyten opined that Plaintiff could perform simple repetitive tasks and retained the ability to understand and recall simple instructions.  (*Id*.)  With regard to Plaintiff's sustained concentration and persistence limitations, Dr. Voyten opined that Plaintiff was moderately limited with regard to the ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id*.)  Dr. Voyten wrote that Plaintiff's MDD affected her ability to verbally comprehend instructions and complex tasks and that one could expect that her ability to understand and remember detailed instructions would be consistent with her learning disability.  (*Id*. at 84.)  Dr. Voyten also wrote that Plaintiff could perform basic household chores and take care of her two minor children.  (*Id*.)  Dr. Voyten opined that Plaintiff could sustain ordinary routines with occasional

prompting.  (*Id.*)  With regard to Plaintiff's social interaction limitations, Dr. Voyten opined that

Plaintiff was moderately limited with regard to her ability to interact appropriately with the

general public and to get along with coworkers or peers without distracting them or exhibiting

behavioral extremes.  (*Id.* at 84.)  Dr. Voyten wrote that Plaintiff had a diagnosis of agoraphobia,

a history of issues with grocery shopping due to her extreme anxiety, and that Plaintiff reported

being uncomfortable around new people.  (*Id.*)  Dr. Voyten opined that Plaintiff could accept

instructions and react in an appropriate manner in order to complete work-life functions,

however, her contact with supervisors, co-workers, and the general public should be limited and

superficial.  (*Id.*)  With regard to Plaintiff's adaptation limitations, Dr. Voyten opined that

Plaintiff might have issues adjusting to and accepting new situations, however, given time, she

could do so.  (*Id.*)  Dr. Voyten further opined that Plaintiff retained the ability to tolerate change

in routine if explained and that she could work in an environment where duties are fairly static.

On November 11, 2014, non-examining state agency psychologist Dr. Tishler reviewed

Plaintiff's file upon reconsideration.  Dr. Tishler re-iterated all of Dr. Voyten's opinions.

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take 'into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

As previously noted, Plaintiff contends that the ALJ committed reversible error when devising Plaintiff's RFC.  The undersigned disagrees.

### A.     The ALJ Did Not Err by Failing to Include a Prompting Limitation in Plaintiff's RFC.

Plaintiff asserts that the RFC devised by the ALJ is not supported by substantial evidence.  Specifically, Plaintiff contends that the ALJ's erred when she failed to incorporate the occasional prompting limitation opined by Dr. Voyten and Tishler into Plaintiff's RFC.

The ALJ summarized the opinions from Drs. Voyten and Tishler as follows:

> At the initial level of review, Karla Voyten, PhD., reviewed the evidence and found that the claimant could perform simple repetitive tasks and retained the ability to understand and recall simple instruction. She also found that claimant could sustain an ordinary routine with occasional prompting and needs contact with supervisors, co-workers and the general public to be limited and superficial . . . . At the reconsideration of review, Carl D. Tishler, PhD., opined that claimant had the same limitation as well as the ability to tolerate change in routine if routine can be explained and she would need to work in an environment where duties were fairly static . . . .

(R. at 531.)

The ALJ then analyzed and weighed those opinions.

> The opinions of State Agency psychological consultants have been given partial weight as they are generally consistent with the weight of the evidence . . . . These opinions have been given partial weight because while they are generally consistent with the evidence, the undersigned has set forth the restrictions in more vocationally relevant terms. For example, while the State Agency limited the clamant to "limited and superficial contact" the undersigned defined the term superficial in the residual functional capacity. It is important to note that throughout the record, the claimant was cooperative and found to have primarily normal findings on mental examinations with only some alteration of her mood. Thus, no greater restrictions would be warranted. Additionally, the undersigned finds that the claimant can have no fast paced work or strict production quotas, and these restrictions consider the State Agency opinions that the claimant would have "fairly static" duties. The State Agency psychologists found that the claimant would need occasional prompting and could tolerate change in routine if routine could be explained, but overall the record supports the finding that the claimant can perform the simple and routine work set forth in the residual functional capacity without these additional limitations. The claimant was able to complete multiple mental status evaluations throughout the record with normal findings and with no noted difficulty with the tasks . . . . She is able to perform a range of daily activities including simple chores, attending her children's activities, shopping, taking her medication, and caring for her personal needs. The claimant also reported improvement with medication and treatment.

(*Id*. at 531–32.)

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929(a). Although an ALJ must consider and weigh medical opinions, the RFC

determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.,* 114 F. App'x 194, 198 (6th Cir. 2004).

"Under the regulations, ALJs 'must consider findings of [s]tate agency medical and psychological consultants,' but ALJs 'are not bound by any findings made by [s]tate agency medical or psychological consultants.'" *Renfro v. Barnhart,* 30 F. App'x. 431, 436 (6th Cir. 2002) (quoting 20 C.F.R. § 404.1527(f)(2)(i)).[4] "[T]he opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.,* 832 F.Supp. 2d 813, 823–24 (S.D. Ohio 2011). This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.;* 20 C.F.R § 416.927(d),(f).[5] "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 823–24.

Plaintiff contends that the ALJ erred because she assigned partial weight to the opinions from Drs. Voyten and Tishler but then failed to adopt into the RFC the prompting limitation that they had both opined. (Pl's Statement of Errors, ECF 10, at PAGE ID # 1103–04.) However, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x

---

[4] Section 404 .1527 applies to claims, like Plaintiff's, that were filed on or before March 17, 2017.

[5] Section 416.927 applies to claims, like Plaintiff's, that were filed on or before March 27, 2017.

267, 275 (6th Cir. 2015) (ALJ was not required to incorporate consulting physician's balancing, avoidance of hazards and vibration, and left arm feeling limitations into RFC even though ALJ gave great weight to that physician's opinions where those restriction were not supported by the record).

Here, the ALJ explicitly found that the overall record supported a finding that Plaintiff could perform simple and routine work as described in the RFC without the occasional prompting limitation.  (R. at 531.)  The ALJ explained that Plaintiff was able to complete mental status evaluations with normal findings and with no noted difficulties and that Plaintiff was able to perform a range of daily activities.  (*Id*. at 531–32.)  Substantial evidence supports the ALJ's analysis.  Results from mental status examinations throughout record found that Plaintiff's cognition was intact or fair.  (*Id*. at 294, 441, 439.)  Similarly, mental status examinations revealed that Plaintiff's thoughts were logical or that Plaintiff's thought processes were goal oriented.  (*Id*. at 357, 444, 441, 439.)  At several times during the relevant period, Plaintiff reported no issues with concentration.  (*Id*. at 284, 357.)  Other records indicated that Plaintiff's recent and remote memory were normal.  (*Id*. at 776, 787, 811.)  In addition, the record reflects that Plaintiff did engage in some daily activities, including taking medications, doing simple chores when possible, cooking simple meals, and socializing with friends on a daily basis.  (*Id*. at 564–66.)  Plaintiff also reported that she spent time with her children and family, went camping and swimming, and exercised and rode bikes.  (*Id*. at 287, 335.)

Plaintiff attempts to undermine the ALJ's analysis by pointing to record evidence that could support the inclusion of a prompting limitation into Plaintiff's RFC.  (Pl's Statement of Errors, ECF 10, at PAGE ID # 1103–04.)  Nevertheless, even if substantial evidence might also support an alternative finding, the ALJ's findings in this case were within the ALJ's permissible

"zone of choice," and the Court will not re-weigh the evidence.  *See Blakley*, 581 F.3d at

406; *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial-evidence

standard allows considerable latitude to administrative decision makers. It presupposes that there

is a zone of choice within which the decisionmakers can go either way, without interference by

the courts.") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).  For these reasons,

the undersigned finds that this allegation of error is without merit.

**B.      The ALJ Did Not Err by Failing to Explain Why a Single-Task Limitation Was Not Included in Plaintiff's RFC.**

Plaintiff also contends that the ALJ's RFC determination is not supported by substantial

evidence because she assigned partial weight to the opinions from Drs. Voyten and Tishler but

then failed to explain why she did not incorporate into Plaintiff's RFC a "one task at a time"

restriction that they had opined.  (Pl.'s Statement of Errors, ECF No. 10; Pl's. Reply, ECF No.

12.)  Although Plaintiff is correct that the ALJ did not incorporate a single task limitation into the

RFC, the undersigned is not persuaded that this constitutes reversible error.

Contrary to Plaintiff's contention, "there is no legal requirement for an ALJ to explain

each limitation or restriction he [or she] adopts or, conversely, does not adopt from a non-

examining physician's opinion, even when it is given significant weight."  *Price v. Comm'r of

Soc. Sec.*, 2:18-cv-128, 2019 WL 396415, at * 2 (S.D. Ohio Jan. 31, 2019) (quoting *Smith v.

Comm'r of Soc. Sec.*, No. 5:11-cv-2104, 2013 WL 1150133, at *11 (N.D. Ohio March 19, 2013)

(citing *Ford*, 114 F. App'x. at 198.))  In this case, the ALJ explicitly explained that she gave the

opinions from Drs. Voyten and Tishler partial weight and explained that she did so because those

opinions were generally consistent with the weight of the evidence.  (R. at 531.)  In addition, the

ALJ explicitly adopted several of the restrictions that Drs. Voyten and Tishler opined or included

restrictions that accounted for the limitations that they had opined.  For instance, the ALJ

included in Plaintiff's RFC the restriction that Plaintiff could not have fast paced or strict production quotas, and explained that this restriction accounted for Drs. Voyten and Tishler's opinions that Plaintiff could only perform "fairly static" duties. (*Id*. at 531.) Similarly, the ALJ included in the RFC a restriction that Plaintiff be limited to occasional but superficial interaction with public, coworkers, and supervisors; defined superficial as the performance of job duties and functions for a specific purpose and short duration; and explained that this restriction accounted for the opinions from Drs. Voyten and Tishler that Plaintiff was restricted to "limited and superficial contact." (*Id*.) This discussion sufficiently described the ALJ's analysis of Dr. Voyten and Tishler's opinions that the ALJ found credible. The ALJ was not required to also discuss all of the limitations that she did not include in Plaintiff's RFC.

Moreover, the evidence substantially supports the RFC devised by the ALJ sans the one-task-at-a-time limitation opined by Drs. Voyten and Tishler. Drs. Voyten and Tishler opined that Plaintiff's memory was impaired such that she could only focus on one task at time. Mental status examinations in the record, however, routinely indicated that Plaintiff's memory was normal. (*Id*. at 776, 787, 811.) Indeed, the ALJ explicitly noted that mental status examinations revealed that Plaintiff's memory was normal, albeit elsewhere in the determination. (*Id*. at 527.) Multiple mental status examinations also indicated that Plaintiff's cognition was intact or fair, that her thoughts were logical or that her thought processes were goal oriented, and that Plaintiff reported no issues with concentration. (*Id*. 294, 441, 439, 357. 441, 444, 441, 439, 284, 357.) For these reasons, the undersigned finds that this allegation of error also lacks merit.

**C.     The ALJ Did Not Err by Failing to Include Additional Off-Task Time in the RFC.**

Plaintiff also alleges that the ALJ's RFC determination is not supported by substantial evidence because it failed to account for the entirety of the time that Plaintiff would be off task

during the workday.  (Pl's Statement of Errors, ECF No. 10, at PAGE ID # 1101.)  Specifically, the ALJ included in Plaintiff's RFC the restriction that she would need to be off task 30 minutes over the course of a workday due to bladder incontinence issues.  (R. at 528, 530.)  Plaintiff appears to argue that this amount of time is not enough to also account for Plaintiff's use of a cane on an as needed basis.  (Pl's Statement of Errors, ECF No. 10, at PAGE ID # 1101.)  This allegation of error is without merit.

First, the record contains no evidence that Plaintiff would need more than 30 minutes to be off task during the workday due to her bladder incontinence.  In addition, the record contains no evidence that Plaintiff would need to be off task for any amount of time due to use of a cane. Instead, state agency reviewing physician Dr. Sutherland noted upon initial consideration that Plaintiff used a cane for balance although no need for a cane had been reported by a recent neurosurgical examiner.  (R. at 81.)  In any event, the ALJ explained that based on Plaintiff's testimony, she determined that Plaintiff's RFC would include a restriction that Plaintiff used a cane on an as needed basis.  (*Id*. at 530.)  Substantial evidence supports the ALJ's determination that Plaintiff use of a cane on an as-needed bases would not cause her to be off task more than 30 minutes during the workday.  The medical records reflect that Plaintiff had normal gait or normal gait and station or that Plaintiff ambulated normally.  (*Id*. at 959, 296, 798, 808, 813, 817, 776, 783, 787, 791.)  The record does not, however, contain any evidence that Plaintiff's as-needed cane use would cause her to be off task for any periods of time during the workday, let alone more than 30 minutes.  For these reasons, this alleged error is meritless.

## VI.    RECOMMENDED DISPOSITION

In sum, from a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  For all the foregoing reasons,

it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors

and **AFFIRM** the Commissioner of Social Security's decision.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of

this R&R, file and serve on all parties written objections to those specific proposed findings or

recommendations to which objection is made, together with supporting authority for the

objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the

R&R or specified proposed findings or recommendations to which objection is made.  Upon

proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the

findings or recommendations made herein, may receive further evidence or may recommit this

matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a

waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a

waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v.*

*Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE